# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**CHARLES GABBY,**

        **Plaintiff,**

        **v.**                                **Case No. 04-C-0476**

**DR. MAIER, DR. LUY, SHARI HEINZ,
SUSAN KOON, JOHN DOE 1, JOHN DOE 2,
JOHN DOE 3, and UNKNOWN,**

        **Defendants,**

---

## DECISION AND ORDER

Plaintiff Charles Gabby, who at all times relevant to this action was a Wisconsin state prisoner, lodged this pro se civil rights action pursuant to 42 U.S.C. § 1983 alleging various violations of his constitutional rights. On February 14, 2005, I screened plaintiff's complaint and allowed him to proceed in forma pauperis on claims under the Eighth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Americans with Disabilities Act (ADA). Currently before me is defendants' third motion for summary judgment, which was filed before the close of discovery and which I denied without prejudice in an order dated March 31, 2008. At that time, I provided deadlines for plaintiff to complete his discovery and file supplemental materials in response to the motion. Both parties have had the opportunity to supplement the record, and the motion is now ripe for decision.

### I. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is required if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the nonmovant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (emphasis deleted). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." Id. For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." Id.

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986), courts should act with caution in granting summary judgment, Anderson, 477 U.S. at 255. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. Id. at 248.

The moving party bears the initial burden of demonstrating that she is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 323. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the non-moving party's case, the moving party may satisfy her initial burden simply by pointing out the absence of evidence. Id. at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. Id. at 322-23. Neither party may rest on mere allegations or denials in the pleadings, Anderson, 477 U.S. at 248, or upon conclusory statements in affidavits, Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1572 (7th Cir. 1989). In considering a motion for summary judgment, I may consider any materials that would be admissible or usable at trial, including properly

2

authenticated and admissible documents.  Woods v. City of Chicago, 234 F.3d 979, 988 (7th Cir. 2000), petition for cert. filed, 70 U.S.L.W. 3163  (U.S. Aug. 28, 2001) (No. 01-37).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, it is "not required to draw every conceivable inference from the record — only those inferences that are reasonable."  Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).

## II.  FACTS[1]

### A.  Diagnosis

Plaintiff was admitted to the Wisconsin prison system in September 2000 and asserts that he complained of a sore throat at that time.  (PPFOF, ¶ 5.)  He references a September 8, 2000, Health Summary that notes his history of alcohol and tobacco use and complaints of a sore throat.  Id.  Plaintiff also presents progress notes from an examination on September 16, 2000, in which Nurse Weber noted that plaintiff has had a sore throat for three months that has not been treated.  (PPFOF ¶ 6.)  Plaintiff maintains that throughout the intake process he informed anyone who would listen that he had a persistent sore throat that had not gotten any better for three months and that he wanted to see someone about it.[2]  (PPFOF ¶ 7.)

---

[1]   Facts are taken from Defendants' Proposed Findings of Fact and Plaintiff's Proposed Findings of Fact.  I will indicate where facts are in dispute and further discuss whether any disputes are material.  To the extent that facts are supported by admissible evidence and are not disputed, I will adopt them.

[2]  Plaintiff believes he was interviewed during the intake process by a Dr. Gary Maier, who he believed to be a medical doctor.  Plaintiff avers that he told Dr. Maier about his sore throat, but that the doctor responded that inmates just look for attention and that nothing was

3

On September 19, 2000, physician assistant James Parish performed an intake physical on plaintiff in the Health Services Unit (HSU) at Dodge Correctional Institution (DCI).  (DPFOF ¶ 8.)  Defendants assert that, during the physical, plaintiff complained of a sore throat that he had been experiencing for a month.  Id.  Parish asked Dr. Luy to examine plaintiff because of his sore throat, and Parish also ordered a throat culture and sensitivity test.  Id.  Throat cultures were taken on September 18 and September 22, 2000, which both showed no bacterial growth, only normal flora.[3]  (DPFOF ¶ 9.)

Plaintiff avers that he complained to prison staff about his throat pain every day from September 19 to September 26, 2000.  (PPFOF ¶ 10.)  He wrote out health services requests to be seen regarding his sore throat and the fact that it was getting worse, not better, and that it was becoming more and more difficult to swallow.  Id.

Plaintiff saw Dr. Luy on September 26, 2000, and reported that his throat hurt and that he was having increasing difficulty in swallowing, especially when he was lying down.  (PPFOF ¶ 12; DPFOF ¶ 9.)  Plaintiff told Dr. Luy that his symptoms had been ongoing for over five weeks.  (DPFOF ¶ 9.)  Plaintiff reported that his throat hurt, especially at night, that he could not sleep well, and that he was taking ibuprofen for the pain.  Id.  Plaintiff did not have an associated fever, fatigue, joint or muscle pain.  Id.  Plaintiff's neck was without tender lymph nodes or masses, and his lung fields were clear.  Id.  Plaintiff also complained of pressure in and around his neck.  (PPFOF ¶ 12.)  He told Dr. Luy that he didn't feel it was

_____

wrong with him.  These assertions are not supported by the medical records presented to me.  (PPFOF ¶¶ 8-9.)

[3]  Plaintiff does not recall a throat culture being taken on September 18, 2000, as Dr. Luy affirms, and there are no medical records documenting such a test.  (PPFOF ¶ 11.)

4

"just a sore throat, something else must be wrong." Id. Dr. Luy ordered another throat culture on September 26 and prescribed ibuprofen for pain. Id.

Again from September 26, 2000, until October 10, 2000, plaintiff submits that he made daily complaints to the prison staff and HSU regarding the increasingly painful throat and difficulty in swallowing. (PPFOF ¶ 13.)

On October 10, 2000, plaintiff saw Dr. Luy again; he told Dr. Luy that when he left to go to a court session from DCI his throat pain got better only to recur. (DPFOF ¶ 10.) Plaintiff also reported that he had blood-streaked phlegm and that he continued to take ibuprofen for the throat pain. Id. Dr. Luy's physical examination of the nose, throat, eardrums and neck was essentially unchanged. Id. His clinical impression at that time was that plaintiff's throat pain remained of uncertain cause and that the blood-streaked phlegm might be throat irritation from the ibuprofen. Id. Dr. Luy advised plaintiff on the cautious use of ibuprofen and advised him to take extra strength Tylenol instead. Id. Dr. Luy also advised plaintiff to inform HSU if the throat pain became worse or if he had any other symptoms like a fever, cough or shortness of breath. Id. Plaintiff submitted a HSU request form on October 15, 2000, that indicated he continued to have throat pain and pressure, including coughing up blood-streaked phlegm. (DPFOF ¶ 11; PPFOF, ¶15.) Verna Lese, R.N. scheduled an appointment for plaintiff on October 18, 2000, with Dr. Joseph Pavelsek. Id. Dr. Pavelsek reported that plaintiff had a very sore throat that became worse when he lied down. (DPFOF ¶ 12.) Plaintiff told Dr. Pavelsek that the pain had been going on for more than two months and also reported that he had been hoarse in the last month. Id. Dr. Pavelsek ordered a chest x-ray and blood tests to rule out any thyroid conditions. Id. Dr. Pavelsek also documented his belief that plaintiff should have a referral

5

to see an ear, nose and throat specialist (ENT).  Id.  An October 20, 2000 chest x-ray was reportedly normal, and plaintiff's blood tests showed an elevated sed. rate (47 mm per hour) and a normal thyroid.  (DPFOF ¶ 13.)

An urgent/class 2 referral to the University of Wisconsin Hospital and Clinics ENT department was made on October 25, 2000, to check plaintiff for any abnormalities to rule out cancer.  (DPFOF ¶ 14.)  Plaintiff saw a UW ENT on November 3, 2000, whose diagnostic testing revealed a "large exophytic right sided piriform sinus tumor with diminished mobility of the right vocal cord."  (DPFOF ¶ 15.)  The ENT recommended a CT scan of plaintiff's neck to evaluate the deep extent of the tumor and planned surgery within three weeks.  Id.  Plaintiff had a social history of alcohol and tobacco use that predisposed him to throat cancer.  Id.  After review with the head/neck oncology tumor board, the oncologist recommended combined modality therapy with primary surgery and radiation therapy.  (DPFOF ¶ 16.)  Plaintiff consented to the approach after discussing the cancer therapy options with his oncologist.  Id.

A November 10, 2000 CT scan confirmed the tumor and plaintiff's throat cancer. (DPFOF ¶ 17.)  On November 14, 2000, plaintiff had an episode of increased bleeding with coughing and pressure in the swallowing.  (DPFOF ¶ 18.)  He was sent to the UW ENT department the same day.  Id.  A repeat endoscopy revealed no further active bleeding, and his airway was not obstructed.  Id.  Plaintiff received a prescription for pain medication to be taken every four hours that continued until his admission to the hospital for surgery.  Id.

**B.  Treatment**

Dr. Luy avers that plaintiff's pain was monitored, and he was medicated for comfort, from November 15, 2000, until he was admitted to the UW Hospital on December 4, 2000.

6

(DPFOF ¶ 19.) Conversely, plaintiff contends he did not receive his pain medications every four hours, as prescribed. (PPFOF ¶ 19.) On November 17, 2000, plaintiff was transferred from DCI to Fox Lake Correctional Institution (FLCI). Id. While at FLCI, plaintiff was not provided with his pain medications every four hours as prescribed, and his pain medications were often delayed by FLCI HSU personnel, who often deliberately ignored and disregarded plaintiff's painful condition and obvious pain. Id. Plaintiff would have to make a written request for the medication and then wait for the HSU's response. Id. At one point, after experiencing numerous and difficult delays in receiving his pain medication, plaintiff filed a complaint, and the response was that a delay in receiving medications is not significant. Id.

Plaintiff underwent surgery on December 4, 2000, to remove the cancerous tumor. (DPFOF ¶ 20.) He developed an opening from the surgical site inside the throat to the outer skin of the neck and remained hospitalized until January 24, 2001, when he was discharged to the DCI infirmary.[4] Id.

The care plaintiff received at the DCI infirmary, beginning on January 24, 2001, included feedings through a tube inserted in his nose down to his stomach, new neck wrapping every day, suctioning around his stoma, and routine stoma care, as well as multiple medications for pain and infection. (PPFOF ¶ 21.) Also, after the surgery, plaintiff could not communicate verbally because his larynx, or "voicebox," had been removed. (PPFOF ¶ 22.) Plaintiff was discharged with an electro larynx to assist him in speaking and was told told an appointment would be made with the speech department; the appointment

---

[4] Defendants make no other affirmations regarding plaintiff's treatment between December 4, 2000 and January 24, 2001. Nor does it appear that plaintiff is challenging the care he received at UW Hospital.

7

never occurred. Id.

Plaintiff was transferred back to FLCI on February 19, 2001. (PPFOF ¶ 23.) Defendants submit that, at that time, plaintiff was able to care for himself. (DPFOF ¶ 22.) However, plaintiff asserts that he still required sterile changing of bandages and cleaning of his wound site, tube feedings, a suctioning machine and medications. (PPFOF ¶ 23.) Also, some of his medications were to be given as needed and some were to be administered at specific times, as outlined in the Health Transfer Summary. Id. Plaintiff could perform some of his own care, but he required the assistance of HSU personnel in order to meet all of his medical needs and to provide adequate care for his medical condition. Id.

Plaintiff avers that he was not provided the medical care prescribed and was not even provided care on a daily basis. (PPFOF ¶ 24.) Plaintiff asserts that his medical records contain no records or progress notes for February 20, 21, 24, 25, 26, 28, 29, or 30, 2001. (PPFOF ¶25.) For example, although plaintiff's medical orders required that he take Roxicet liquid every 3 to 4 hours for pain, plaintiff had to request his medicine in writing to the HSU. (PPFOF ¶ 26.) At times, plaintiff would go more than 6 hours without pain medication. Id.

Plaintiff also alleges that he was not routinely provided the necessary sterile supplies to keep his large neck wound and stoma area clean and sterile. (PPFOF ¶ 27.) Plaintiff alleges that he had to reuse bandages and gauze applied to his neck to absorb the blood, pus, and saliva being discharged from his neck. Id. He requested hydrogen peroxide, but was told that it was a security risk. Id. In fact, plaintiff was not provided any special accommodation to keep the necessary medical supplies in his cell so that he could actually provide himself care. (PPFOF ¶ 27.) Plaintiff's progress notes do not contain any indication that plaintiff's neck wound was clean packed, wrapped, or examined for signs of infection.

8

Id.

Defendants represent that plaintiff had visits with HSU on February 22 and 23, 2001, and expressed no concerns. (DPFOF ¶ 22.) They further submit that plaintiff continued taking pain medication every three to four hours around the clock. Id. Plaintiff does not remember "not expressing his concerns to Nurse White on February 22 and 23, 2007." (PPFOF ¶ 28.) However, he also asserts that any failure to express concerns does not mean that he was satisfied with his medical treatment. Id. Plaintiff points out that during this time, he was recovering from major surgery, was on a feeding tube, was in excruciating pain, was dealing with the fact he had cancer, and was possibly facing another surgery for the mass on the left side of his neck (more cancer). Id. He also could not communicate readily or regularly because his voice box had been removed. Id.

A February 26, 2001, CT scan of plaintiff's neck revealed a cystic left neck mass representing an abscess with swelling of the soft tissue of the left neck (DPFOF ¶ 23; PPFOF ¶ 29.) Dr. Luy treated plaintiff on March 1, 2001 and increased his pain medications. (DPFOF ¶ 24; PPFOF ¶ 30.) Plaintiff complained of a tremendous amount of pain on the left side of his neck and said he was losing sleep because of the pain. Id. Plaintiff returned to the UW ENT department on March 3, 2001, at which time a fine needle aspiration of the left neck revealed no evidence of infection or tumor. (DPFOF ¶ 25.) Nevertheless, Dr. Luy started plaintiff on an antibiotic for probable infection and advanced plaintiff to a soft diet. Id.

Dr. Luy asserts that a HSU nurse monitored plaintiff for "flu like symptoms" on March 6, March 7 and March 9, 2001. (DPFOF ¶ 26.) Plaintiff avers that on those dates Nurse White checked his temperature but did not examine his wound site. (PPFOF ¶ 31.)

9

Plaintiff was informed on March 9, 2001, that the UW ENT department wanted him to have an open biopsy of the left neck mass due to the inconclusive results of earlier needle biopsies. (DPFOF ¶ 27.) The open biopsy was performed on March 20, 2001, and revealed recurrent cancer. (DPFOF ¶ 28.) Radiation oncologist Dr. Tannehill became involved in plaintiff's case and recommended comprehensive curative radiation to both necks followed by selective surgery to the left side. Id. Dr. Tannehill advised plaintiff that he should have some dental extractions before the surgery. (DPFOF ¶ 28; PPFOF ¶ 32.) Dr. Tannehill also discussed with plaintiff the acute and latent side effects associated with radiation therapy. Id. Plaintiff wanted to wait until the first week of April 2001 before beginning radiation therapy so that he could consult with his relatives and seek a dental opinion regarding the extractions. (DPFOF ¶ 28; PPFOF ¶ 32.)

Plaintiff was discharged from the UW hospital on March 23, 2001, with new pain medication and sleep aids. (DPFOF ¶ 29; PPFOF ¶ 33.) Dr. Luy met with plaintiff on March 26, 2001, to discuss Dr. Tannehill's recommendation about the extraction of his teeth prior to radiation therapy. (DPFOF ¶ 30.) Although not referenced in Dr. Luy's progress note, plaintiff indicates that he raised the issue of whether extractions should take place in light of a "cyst" the oral surgeon saw and the issue of whether the extraction could take place at FLCI. (PPFOF ¶ 34.) On March 28, 2001, plaintiff requested that the radiation be postponed due to concerns raised by the dentist with whom he consulted. (DPFOF ¶ 31.) Plaintiff avers that was receiving conflicting information regarding what was medically necessary and what was the best treatment for him. (PPFOF ¶ 35.) Plaintiff did not want a dentist doing the extraction because Dr. Tannehill had told him that an oral surgeon was necessary. Id.

10

On April 11, 2001, a repeat panoramic view of plaintiff's teeth was done at DCI and sent to UW radiology for interpretation. Dr. Tannehill's service relayed a message that plaintiff needed to proceed with radiation therapy quickly since the cancer in his neck was growing rapidly. (DPFOF ¶ 32; PPFOF ¶ 38.) Plaintiff agreed. Id. However, at his first appointment for radiation therapy on April 18, 2001, plaintiff refused to go through with the treatment. (DPFOF ¶ 32.) He said he did not want to start treatment "until his teeth are pulled." Id. An April 19, 2001, letter from Dr. Tannehill to plaintiff indicated that a new set of jaw x-rays showed plaintiff's teeth were in rather good shape and that a root canal, rather than teeth extractions, could preserve the health of the jaw bone. (DPFOF ¶ 33.)

Nevertheless, plaintiff began radiation therapy without having any dental work performed first. (DPFOF ¶¶ 33-34.) Between April 24, 2001, and June 11, 2001, plaintiff had thirty-five radiation treatments. (DPFOF ¶ 34; PPFOF ¶ 40.) During that time, plaintiff was transported back and forth between UW and FLCI. (PPFOF ¶ 40.) Also during that time, plaintiff developed difficulty swallowing and eating and had a reoccurrence of his right fistulas. Id. On May 15, 2001, plaintiff had a stomach tube placed during an overnight stay at UW Hospital. (DPFOF ¶ 35.) The right neck fistula was quite large and draining prurulent fluid; it was treated with gauze, neck wrappings and IV Unasyn. Id. Upon plaintiff's release, doctors prescribed an antibiotic and pain medications every four hours. Id.

Plaintiff alleges that the medical records documenting his care from April 24 through July 8, 2001 are "spotty." (PPFOF ¶ 41.) In fact, no progress notes exist for April 27-29, 2001 & May 1, 3, 6,8, 10 -15, 17-20, 22-24, 26-31,2001 and June 2-9, 11-13, 15-28, 30-31, 2001 & July 1-7, 2001. Id. Plaintiff continued to receive his pain medications sporadically, rather than as scheduled, and he was not receiving any wound care. Id. The FLCI HSU did

11

not regularly clean plaintiff's fistulas or offer him supplies to keep his fistulas clean. (PPFOF ¶ 42.) Consequently, plaintiff began experiencing new fistulas, openings that went from the outside through to the inside of his neck, which were at high risk of becoming infected. (PPFOF ¶ 41.) Plaintiff also experienced complications with his stoma and feeding issues. Id.

On May 15, 2001, plaintiff received medical treatment for his fistulas at UW because they had gotten larger and become infected. (PPFOF ¶ 41.) Upon his discharge back to FLCI, plaintiff again was not provided medical care for his fistulas, despite orders provided by the UW medical personnel. (PPFOF ¶ 44.)

On June 29, 2001, plaintiff saw Dr. Tannehill, and a CT scan revealed a decrease in the size of plaintiff's left neck mass. (DPFOF ¶ 36.) A follow up appointment was scheduled for August 24, 2001. Id. Plaintiff was hospitalized from July 9 through July 13, 2001, for a left side neck dissection and surgery to close the right side fistula. (DPFOF ¶ 37.) He continued his previous medications and tube feeding. Id. On July 15, 2001, Dr. Luy examined plaintiff's surgical wound, which was well healed with no fistula. (DPFOF ¶ 38.) The staples were then removed. Id. On July 20, 2001, the ENT specialist examined plaintiff and also found the neck incision well healed with minimal redness and no fistula. (DPFOF ¶ 39.) The ENT specialist recommended that plaintiff gradually begin with clear liquids and advance to a soft diet, continue to take pain medication as needed and have follow up CT scans in three and nine months. Id. However, on July 22, 2001, plaintiff slipped on water on the floor, and the incision on the left side of his neck opened. (DPFOF ¶ 40; PPFOF ¶ 45.) He was taken to the emergency room at Waupun Memorial Hospital. Id. According to defendants, plaintiff refused suturing and stapling of the five centimeter

12

opening with three millimeter gaping and refused for the wound to be dressed.  Id.  Plaintiff avers that he elected to keep the surgical site open because he was told that he had an appointment with the UW ENT coming up "soon."[5]  (PPFOF ¶ 45.)  Plaintiff wanted the UW ENT medical personnel to be able to properly assess his condition and provide the best option for care, since they had provided the surgery and were familiar with his condition.  Id.  Plaintiff was under the impression, considering his medical condition and that he had a large hole which was through to the inside of his throat, visibly exposing his internal neck to the air and infection, that a UW ENT appointment would be scheduled immediately.  Id.

On July 26, 2001, FLCI HSU medical staff allegedly observed plaintiff eating and purchasing canteen items, but plaintiff denies that he was observed eating these canteen items.  (PPFOF ¶ 47.)  Plaintiff asserts that he purchased the canteen items so that he could pay other inmates with the items to do his laundry.  Id.

Dr. Luy saw plaintiff on July 31, 2001, for complaints of headaches.  (DPFOF ¶ 42.)  There was a concern that plaintiff's hygiene was being affected by too many narcotics; as a result, Dr. Luy reduced plaintiff's dosage of Fentanyl and Roxicet, and discontinued Oxycodone.  Id.  There is no indication in the medical records that plaintiff expressed concerns or inquired about his upcoming appointment at UW Hospital.  Id.  Dr. Luy avers that plaintiff had a set appointment with UW Radiology Oncology for August 24, 2001, and, if plaintiff had inquired, he would have been told the appropriate week but not the exact day

---

[5]  According to the medical records, plaintiff did not have a scheduled appointment with UW Radiology Oncology until August 24, 2001.  (PPFOF ¶ 48.)  Plaintiff denies that he did not inquire about the appointment.  Id.  Rather, he maintains he requested daily that he be sent to UW to have the hole in his neck examined.  Id.  Plaintiff avers that he complained to the FLCI HSU every day from July 22 through August 5, 2001.  (PPFOF ¶ 46.)

13

of his appointment for security reasons.  Id.

On August 5, 2001, plaintiff was in his cell when a large artery in his neck burst open and be began bleeding profusely.  (PPFOF ¶ 49.)  Plaintiff grabbed a towel to apply pressure to his neck.  Id.  Plaintiff could not speak and "call for help," so he had to leave his cell.  Id.  He got the attention of the FLCI guards by tapping them on the shoulder.  Id.  Plaintiff was told to sit down, and the guards went to the FLCI HSU and alerted Nurse Burling.  Id.  Nurse Burling found plaintiff sitting in a chair holding a blood-soaked towel to his neck.  (DPFOF ¶ 43.)  Nurse Burling applied four 8x10 gauze pads as a pressure dressing.  Id.  Plaintiff was then loaded on the ambulance stretcher "in sitting position holding pressure."  Id.  Plaintiff remembers the medical staff trying to push him to lie back on the gurney.  (PPFOF ¶ 49.)  He could not communicate verbally and because he was using his hands to apply pressure to the artery so he could not write anything down.  Id.  Plaintiff was trying to let the staff know that if he were to lie down he could choke to death because the blood was dripping into his stoma which is his only airway and which leads directly into his lungs.  Id.

Plaintiff was transferred to the emergency room of Waupun Memorial Hospital.  (DPFOF ¶ 43.)  The emergency report indicates there was "spurting blood from left side of neck most likely from an artery."  Id.  Emergency room staff connected plaintiff to an oxygen source and administered IV fluids.  Id.  Plaintiff was then flown to UW Hospital for emergency surgery.  (PPFOF ¶ 49.)  He lost approximately two units of blood, but he was no longer bleeding by the time he arrived at UW and was admitted to the ICU.  (DPFOF ¶ 43.)  An angiography revealed an inferior thyroidal aneurysm as the source of the bleeding.  Id.  Dr. Luy asserts that the bleeding from the interior thyroidal aneurysm was an

14

unforeseeable event, which happened, but could not have been prevented or anticipated. (DPFOF ¶ 43.)

When plaintiff awoke from surgery, he was in four point restraints (hands and feet both restrained), which meant that he had absolutely no ability to hit a call button, which would have been his only means to get anyone's attention. (PPFOF ¶ 50.) Plaintiff could not speak and therefore had to lie in the room in four point restraints with no ability to call any personnel. Id. The FLCI guard who was supposed to be observing him had taken a lunch break. Id. Plaintiff woke up in excruciating pain and was in unfamiliar surroundings after only knowing that he was going in to surgery for an artery bleed in his neck. Id.

Plaintiff underwent a surgical attempt at closing the fistula with a skin graft on August 7, 2001. (DPFOF ¶ 44.) He tolerated the procedure well and was stable for his transfer back to the UW prison ward. Id. Over the next several weeks, plaintiff remained at UW and developed a number of fistulas which were managed conservatively. (DPFOF ¶ 45.) Plaintiff underwent another surgery on September 24, 2001, in which a pectoral muscle was used to cover the opening in his neck. Id. The post operative report indicated that plaintiff did quite well and the skin grafts took very well. Id. He had some pain issues throughout his hospital stay and a pain consult was brought in for recommendation of pain management; he tolerated the recommended regimen well. Id. On October 3, 2001, plaintiff was discharged to DCI infirmary for tube feedings; he could not eat anything by mouth at that time. (DPFOF ¶ 46; PPFOF ¶ 52.)

At an ENT appointment on October 12, 2001, they found three to four fistula sites along his suture line through which saliva and blood were flowing. (DPFOF ¶ 47; PPFOF ¶ 53.) Plaintiff was kept on the tube feeding, and the fistulas were managed conservatively

15

with neck wrappings. (DPFOF ¶ 47.)

During this time, plaintiff was again unable to speak, and he was not provided any means to communicate emergencies to DCI HSU staff. (PPFOF ¶ 53.) He can no longer use a speaking device because he has very little of his neck remaining after all of the surgeries. Id. The call button he was provided activated a speaker which the staff would use to ask him what he needed. Id. Plaintiff was very frustrated because he had been without a voice box for almost a year and could not respond to the staff. Id. He asserts that many DCI HSU staff would just ignore his call because he couldn't "tell" them what he wanted through the speaker system. Id.

Plaintiff returned to the UW ENT Department on October 26, 2001, November 16, 2001 and November 30, 2001 (DPFOF ¶ 48.) By November 30, 2001, plaintiff's fistulas were slowly improving. (DPFOF ¶ 49.) Plaintiff expressed a desire to return to FLCI. Id. He avers that he wanted to return to FLCI to get his personal items. (PPFOF ¶ 54.) At that point, he had been without his personal items for over six months. Id. On December 3, 2001, Dr. Joseph removed plaintiff's feeding tube at the DCI infirmary. (DPFOF ¶ 49.) Plaintiff had appointments to go back to the UW ENT Department for further follow-up on January 11, 2002 and February 1, 2002, but he refused to go to both of these appointments. (DPFOF ¶ 50.)

On March 8, 2002, plaintiff saw the ENT Specialist who found that there was a decrease in the fistula drainage, and arrangements were then made for the removal of the esophageal stent. (DPFOF ¶ 51.) Plaintiff was transferred to FLCI from DCI on March 12, 2002. (PPFOF ¶ 55.) Plaintiff submits that FLCI would not provide him with the medical care and supplies needed for him to provide his own "self care." Id. At that time, plaintiff

16

was still on a feeding tube and still experiencing pain and still having problems with fistulas.
Id.

Plaintiff's stent was removed by a UW ENT specialist in a surgery on April 29, 2002. (DPFOF ¶ 52.)  On April 30, 2002, Dr. Luy saw plaintiff.  (DPFOF ¶ 53.)  According to Dr. Luy's notes, plaintiff was pleased with the closure of the left fistula and had started to eat foods daily with a resource supplement.  Id.  It was also noted that plaintiff was agreeable to tapering his Fentanyl patch and Roxicet liquid gradually.  Id.

Dr. Luy treated plaintiff again on June 13, 2002, when a small fistula left side of neck opened up again.  (DPFOF ¶ 54.)  An ENT appointment was scheduled for plaintiff for June 28, 2002.  Id.  Plaintiff asserts that, at that appointment, Dr. Luy did not address the lack of any medical notations by FLCI HSU personnel.  (PPFOF ¶ 56.)  According to plaintiff, he received no medical treatment from April 30, 2002 until Dr. Luy saw him on June 13, 2002. Id.  Moreover, plaintiff avers that he was not provided needed materials or a sterile environment in which to properly address his medical needs.  Id.

Defendants assert that plaintiff pulled his feeding tube out by himself on June 27, 2002, and requested to be placed on a regular diet.  (DPFOF ¶ 55.)  On June 28, 2002, plaintiff went to the UW ENT Department where the ENT Specialist indicated that the small fistula had healed nicely.  (DPFOF ¶ 56.)  Plaintiff complained that his lower teeth were loosening with increasing pain, and he had an oral surgery consult for removal of the affected teeth scheduled for August 2, 2002.  Id.

On August 2, 2002, plaintiff started to experience complications and saw the ENT Specialist again.  (DPFOF ¶ 57; PPFOF ¶ 57.)  A flexible endoscopy showed no evidence of cancer recurrence, but a CT scan of plaintiff's neck, with IV contrast was recommended

17

to evaluate possible fistula and rule out evidence of cancer recurrence. (DPFOF ¶ 57.) On August 9, 2002, plaintiff was sent to the ER Department of the UW, and a feeding tube was put in since he was unable to swallow and fluid was seen in the stoma. (DPFOF ¶ 58.)

On August 30, 2002, plaintiff removed his feeding tube, stating he could not tolerate the tube feeds and had eaten orally. (DPFOF ¶ 59.) He was advised by the ENT Specialist of potential complications, including infections, that could cause carotid blowout, a large bleed, or death. Id. Despite this counseling, plaintiff chose to continue eating orally. Id. On October 4, 2002, plaintiff saw the ENT Specialist and was adamant in refusing tube feeds. (DPFOF ¶ 60.) He had no drainage from the left side of his neck, and a CT scan of the neck revealed no evidence of cancer recurrence or fistulas. Id. Therefore, the ENT Specialist gave permission to FLCI to give plaintiff a general diet. Id.

Defendants present evidence that plaintiff was seen in the HSU by nurse Sue McMurray fifteen times between October 2002 and March 2005. (DPFOF ¶¶ 61, 63.) Plaintiff saw Dr. Luy on January 10, 2003, for an infection in his neck that was treated with antibiotics. (DPFOF ¶ 62.). Plaintiff refused at least four appointments with the UW ENT department between 2002 and 2005. (DPFOF ¶ 64.) Plaintiff explains that he refused to see the ENT at UW because of the way in which the visits were conducted and the toll outside appointments took on his health. (PPFOF ¶ 58.) Plaintiff was not made aware of his appointments until thirty minutes or an hour in advance, so he was unable to prepare his supplies, including his resource drink.[6] (PPFOF ¶ 61.) The FLCI HSU made no provisions

---

[6] Plaintiff has at all times been on a liquid diet, including an energy drink called resource, that he uses to maintain a healthy weight and provide him with energy. (PPFOF ¶ 59.) When plaintiff eats any solid food, it creates an uncomfortable and distressing situation. (PPFOF ¶ 60.) Eating often includes periods of choking and throwing up, or

18

for plaintiff to receive nutrition, pain medication, any other medication, or any liquids whatsoever, for medical appointments where plaintiff could be gone from FLCI for eight to ten hours for a fifteen minute follow-up appointment. Id. Plaintiff refused the appointments because they took a larger toll on his health than not seeing UW medical personnel. Id.

Dr. Luy saw plaintiff on June 7, 2005, to evaluate his cancer status and arrange a follow up with the UW ENT department or a CT scan of plaintiff's neck. (DPFOF ¶ 65.) Plaintiff indicated there had been no change in his status in the past two years and denied any signs or symptoms of concern. Id. Plaintiff confirmed that he was adequately nourished with almost the regular soft diet supplemented by two cans of resource a day. Id. Dr. Luy's examination of plaintiff's neck revealed a healthy pectoral muscle flap with no breakdown or fistulous openings, and the trach stoma showed no ulceration and there were no palpable neck nodes or masses. Id. Plaintiff's heart, lungs and abdominal area were unremarkable. Id. Dr. Luy discussed plaintiff's follow-up options with him, and plaintiff continued to refuse an ENT specialist appointment. (DPFOF ¶ 66.) Dr. Luy also avers that plaintiff would not accept the use of a voice amplifier for communication. Id. In contrast, plaintiff affirms that he never refused a voice amplifier for communication. (PPFOF ¶ 63.) Rather, plaintiff submits that he could not utilize a voice amplifier after his last major surgery because no flat or smooth surface exists in the structure of his neck anymore where the voice amplifier can be placed. Id.

The plaintiff's lab reports from June 10, 2005 were essentially normal. (DPFOF ¶ 67.)

_____

coughing up food, and an average meal takes plaintiff approximately one hour to consume Id. Plaintiff prefers to eat by himself, and eating solid food leaves him physically exhausted. Id.

19

The reports were sent to plaintiff, and he was scheduled for a follow up appointment with Dr. Luy on September 14, 2005 to discuss the lab report. Id. Plaintiff did not show up for the follow up appointment and told the HSU correctional officer that he was refusing to be seen. Id.

### III. ANALYSIS

Defendants argue that the undisputed evidence in the record shows that Dr. Luy was not deliberately indifferent to plaintiff's serious medical need. Defendants also contend that defendants Maier and Koon should be dismissed because they had no personal involvement in plaintiff's care. Defendants further argue that defendant Heinz was not employed at FLCI during the time frame plaintiff alleges she was deliberately indifferent to his serious medical need. Finally, defendants argue they are immune from suit under the ADA.

Plaintiff contends that material facts exist to create a genuine issue for trial on whether defendants were deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment. He also objects to the Second Affidavit of Dr. Luy and maintains that defendants' evidence does not conform to Federal Rule of Civil Procedure 56(e) or Federal Rule of Evidence 403. Next, plaintiff concedes that defendants Maier and Koon were not personally involved in his care, and he does not object to their removal as defendants in this action. However, plaintiff disputes defendants' argument the Heinz should likewise be dismissed. Plaintiff also argues that his ADA claim should not be dismissed and asks me to add the Wisconsin Department of Corrections (DOC) as a defendant in this action.

20

## A.    Evidentiary Issues

As an initial matter, I will address the parties' arguments regarding affidavits.  In response to defendants' third motion for summary judgment, plaintiff argues that defendants' evidence does not conform to Federal Rule of Civil Procedure 56(e) or Federal Rule of Evidence 403.  He also argues that, under Fed. R. Civ. P. 56(g), the second affidavit of Dr. Luy was presented solely for the purpose of delay.  Although plaintiff acknowledges that Dr. Luy's Second Affidavit refers to medical records to support his affirmation, plaintiff nevertheless asks for attorney fees and costs for responding to defendants' third motion for summary judgment.

In a decision and order dated September 27, 2006, I denied defendants' motion for summary judgment because it relied entirely on the affidavit of Dr. Luy and copies of plaintiff's medical records were not submitted with Dr. Luy's affidavit summarizing them. However, the  Second Affidavit of Enrique Luy, M.D., filed May 16, 2007, remedied the defects of the first.  It was based on his personal knowledge and his review of plaintiff's medical records, and it incorporated the underlying medical records as exhibits.

Additionally, to the extent defendants suggest that plaintiff's affidavit is not sufficient to create a genuine issue of material fact, they are wrong.  An affidavit is evidence.  Lax v. City of South Bend, 449 F.3d 773 (7th Cir. 2006) (The Seventh Circuit remanded an excessive force case after the district court improperly granted summary judgment in favor of defendants where plaintiff's affidavit conflicted with defendants' affidavits; plaintiff's version of the incident as set forth in his affidavit created a genuine issue of material fact.)

Case 2:04-cv-00476-LA   Filed 07/29/09   Page 21 of 30   Document 76

**B.    Parties**

Defendants contend that defendants Maier and Koon should be dismissed because they had no personal involvement in plaintiff's care.  Plaintiff agrees that defendants Maier and Koon were not personally involved in his case and has consented to their removal as defendants in this case.  Therefore, I will dismiss them.

Additionally, defendants argue that defendant Heinz was not employed at FLCI during the time frame plaintiff alleges she was deliberately indifferent to his serious medical need. Defendant Shari Heinz ("Heinz") is a registered nurse.  She was employed as the Health Services Manager at the FLCI from December 30, 2001 until August 20, 2005. As part of her duties as manager of the health services unit Heinz is a custodian of the records of medical treatment for inmates incarcerated at FLCI, which are regularly conducted business records of the health services unit.  (DPFOF ¶ 70.)  Plaintiff's complaint indicated that Heinz was deliberately indifferent to his serious medical need between July 22, 2001 and August 5, 2001, and defendants have submitted evidence that Heinz did not begin her employment at FLCI until December 30, 2001.  (DPFOF ¶ 71.)  Nevertheless, plaintiff contends that Heinz was deliberately indifferent to him at a later time, after she began working at FLCI. It is unclear whether the dates referenced in plaintiff's complaint were an error or whether discovery produced evidence regarding Heinz's later involvement.  Either way, I will not bind plaintiff to the specific dates set forth in his pro se complaint, filed over five years ago.  Heinz was on notice of plaintiff's allegations against her.  See Fed. R. Civ. P. 8(a).

**C.    42 U.S.C. § 1983 Claim: Eighth Amendment**

In Duckworth v. Ahmad, 532 F.3d 675, 678-79, the Seventh Circuit set forth the legal

22

standard for Eighth Amendment medical care claims:

> The states have an affirmative duty to provide medical care to their inmates. Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). And the upshot of this duty is that the "deliberate indifference to [the] serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'" and violates the Eighth Amendment's prohibition against cruel and unusual punishments. Id. at 104, 97 S.Ct. 285. To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent. Sherrod v. Lingle, 223 F.3d 605, 610 (7th Cir. 2000). Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts. Id. And although deliberate means more than negligent, it is something less than purposeful. Farmer v. Brennan, 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The point between these two poles lies where "the official knows of and disregards an excessive risk to inmate health or safety" or where "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he ... draw[s] the inference." Id. at 837, 114 S.Ct. 1970. A jury can "infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment." Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006).

There is no dispute that plaintiff's condition constitutes a serious medical need. Although the severity of his may not have been known at the time of plaintiff's admission to the prison system in September 2000, when plaintiff initially complained of a sore throat, defendants do not dispute that plaintiff suffered a serious medical need at all times relevant to this case. Thus, I will consider whether defendants were deliberately indifferent to plaintiff's serious medical need. To that end, I will consider the diagnosis of plaintiff separately from his subsequent treatment.

**Diagnosis**

Plaintiff entered the Wisconsin prison system in September 2000. At that time, he complained of a sore throat. He went through two months of evaluation and escalating treatment before he was diagnosed with throat cancer. This is not unreasonable and does not exhibit deliberate indifference, even when the evidence is viewed in the light most favorable to plaintiff. Although plaintiff submits that he made almost daily complaints regarding his sore throat (implying that he should have been treated as frequently as he made complaints), he received regular follow up examinations and the doctors ordered tests and referrals that resulted in a diagnosis that allowed plaintiff to begin receiving treatment. Even assuming plaintiff complained every day, it is not deliberate indifference for medical staff to refrain from responding to each and every complaint or request for treatment. Just because a patient is not seen each day, that does not suggest that the medical staff is deliberately indifferent.

"Before a doctor will be found deliberately indifferent, the plaintiff must show subjective indifference. The nub of this subjective inquiry is what risk the medical staff knew of and whether the course of treatment was so far afield as to allow a jury to infer deliberate indifference." Duckworth v. Ahmad, 532 F.3d 675, 680 (7th Cir. 2008) (internal citations omitted). Plaintiff has not presented evidence that the treatment he received before he was diagnosed with cancer was "so far afield of accepted professional standard as to raise the inference that it was not actually based on medical judgment." Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006).

Plaintiff suggests that cancer should have been suspected as soon as he reported a sort throat because he admitted to a history of alcohol and drug use and there can be a

24

link. It would be illogical for medical professionals to assume immediately that a report of a sore throat was cancer. It certainly was not deliberately indifferent to rule out other, more common, possibilities before testing for cancer.

Plaintiff also seems to suggest that he only received the referral to a specialist because he saw Dr. Pavelsek instead of Dr. Luy on October 18, 2000. Yet there is no explanation of why plaintiff saw Dr. Pavelsek instead of Dr. Luy on October 18, 2000, and there is no evidence to suggest that Dr. Luy would not have followed the same course as Dr. Pavelsek and ordered additional tests, including a chest x-ray, and referred plaintiff to the UW ENT department. Plaintiff's diagnosis took only two months, from his entry into the custody of the Wisconsin Department of Corrections until a doctor at UW found a tumor and confirmed a diagnosis of throat cancer with a CT. Thus, I conclude that there was no deliberate indifference to plaintiff's serious medical need through November 10, 2000.

**Treatment**

Conversely, plaintiff's treatment after his cancer diagnosis contains many disputed facts. Plaintiff submits evidence that, beginning immediately after his diagnosis, pain medications prescribed for him were not given as prescribed (at the right times), if they were given at all. A reasonable jury could conclude that not giving a cancer patient his prescribed pain medication constitutes deliberate indifference.

Plaintiff also provides evidence regarding the care he received when he returned to DOC facilities from the UW hospital on January 24, 2001. From that point on, a reasonable jury could certainly conclude that defendants were indifferent to plaintiff's medical condition. Plaintiff was a cancer patient with intermittently open wounds. A reasonable jury could conclude that plaintiff should have been seen more frequently. A reasonable jury also could

25

conclude that plaintiff should have been supplied with ample fresh supplies to care for his wound, especially if he was expected to do it himself. The combination of these problems and the pattern that developed and continued, even after plaintiff began suffering serious complications, is troubling.

Defendants suggest that, as time passed, the inadequate treatment was plaintiff's own fault due to his choices, including the decision to return to FLCI and his refusal of follow up appointments. Yet plaintiff explains his frustration with his condition and the treatment, as well as his reasons for these choices.

When the evidence is viewed in the light most favorable to plaintiff, he was consistently denied his pain medication and expected to treat his own surgical wounds. Additionally, the record does not indicate attentive treatment to plaintiff by Dr. Luy. In one instance, Dr. Luy reduced plaintiff's pain medication due to concerns over plaintiff's hygiene while taking narcotics just days before plaintiff was rushed to the emergency room. I cannot grant summary judgment in favor of defendants where a prisoner with cancer, recovering from surgery, suffering complications in the form of fistulas and dealing with the effects of radiation therapy, is not seen daily and is expected to change his own bandages and clean his own wound site. Plaintiff will be allowed to continue with his 42 U.S.C. § 1983 claim under the Eighth Amendment that Dr. Luy, Shari Heinz and other unnamed defendants were deliberately indifferent to plaintiff's serious medical needs, both at DCI and FLCI, after November 10, 2000.

**D.    ADA Claim**

Defendants argue they are immune from suit based on the ADA because the ADA creates liability on the part of state agencies only, rather than state employees. <u>Walker v.</u>

26

<u>Snyder</u>, 213 F.3d 344, 346 (7th Cir. 2000) (overruled on other grounds).[7]  Plaintiff basically concedes the point, however suggests that it is premature to grant summary judgment on his ADA claim.  Plaintiff added the "Unknown" party  in his complaint so that he could add necessary entities after sufficient discovery. To remedy defendants' concern,  plaintiff asks the court to substitute the DOC for the "Unknown" entity he originally sued as the defendant in his ADA claim.  He cites Federal Rule of Civil Procedure 21, which states that misjoinder is not a ground for dismissal of an action.  He also points to Rule 19(a), which provides that a person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party if in the person's absence  complete  relief  cannot  be  accorded  among  those  already  parties.    Plaintiff maintains that he cannot be afforded complete relief without the DOC being joined, and thus believes it should be necessary for the Court to join the DOC.

I  grant  summary  judgment  to  defendant  Unknown  on  the  ADA  claim.    Plaintiff's Complaint refers to the unknown guard as an individual, not as an entity.  Regardless of which guard  ultimately restrained plaintiff, he could not be personally liable under the ADA based § 1983 claim.  Furthermore, it is clear that the § 1983 claim based on plaintiff's Eighth Amendment rights could not be pursued against the DOC if substituted.  Liability under § 1983 is based on personal fault, <u>*Cygnar v. City of Chicago*</u>, 865 F.2d 827, 847 (7th Cir.

---

[7]  The ADA does allow for official capacity claims against individual defendants to the extent they are proxies for the state.  <u>See</u> <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58 (1989).  However, in such cases, plaintiffs can only obtain injunctive relief because the Eleventh Amendment bars claims for money damages against officers of a state sued in their official capacities.  <u>See</u> <u>Omosegbon v. Wells</u>, 335 F.3d 668, 672-72 (7th Cir. 2003). There are no appropriate defendants who have been sued in their official capacity in this case, against whom plaintiff's ADA claim could survive.

1989); *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982), not *respondeat superior* liability. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Monell v. Department of social Services*, 436 U.S. 658, 699 n.58 (1978). Thus plaintiff would forfeit his 42 U.S.C. § 1983 claim against guard Unknown by substituting the DOC in for him. Under the circumstances Rule 21 does not prohibit Summary Judgment over the ADA claim because "Unknown" was not misjoined.

Nor does rule 19(a) require joinder of the DOC because complete relief is available between the named parties. Plaintiff essentially argues that he cannot obtain relief for his ADA claim unless the Court substitutes the DOC for Unknown. This is incorrect. As demonstrated above, plaintiff cannot obtain relief on his ADA claim because individual employees are not personally liable under that claim. The "complete relief" referred to in rule 19(a) is between those already parties. Morgan Guaranty Trust Co. of New York v. Martin, 466 F.2d 593, 598 (7th Cir. 1972); See also United States v. County of Arlington, 669 F.2d 925, 929 (4th Cir. Va. 1982)("Complete relief refers to relief as between the persons already parties, not as between a party and the absent person whose joinder is sought …")(citing 3A Moore's Federal Practice P 19.07-1(1) at 19-128). Thus the prospective ADA claim against the DOC is not properly considered.

### E.     Identification of John Does

Plaintiff has not yet identified defendants he named as John Does. However, in Plaintiff's Additional Proposed Findings of Fact In Support of his Response to Defendants' Third Motion for Summary Judgment, plaintiff has identified several previously unnamed individuals he suggests were deliberately indifferent to his medical needs, including: Albert Klem, Health Services Manager; Susan McMurray, R.N.; Nancy White, R.N.; and Tom

28

Burling, R.N. Although it appears that plaintiff is attempting to identify these individuals as the John Does originally named in his complaint, plaintiff has failed to file any motion to amend or correct the caption, to amend his complaint, or to identify the John Does. As such, the John Does will not be substituted for at this time.

F.    **Status Conference**

I will hold a telephonic conference with the parties on August 18, 2009 at 2:30 p.m. regarding the status of this case. At that time, the parties should be prepared to discuss the identification of previously unnamed defendants. Additionally, we will consider the most efficient means for service of the complaint on newly named defendants, the time they will need to answer the complaint and future scheduling.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that defendants' third motion for summary judgment (Docket #58) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Dr. Maier is **DISMISSED** as a defendant in this litigation.

**IT IS FURTHER ORDERED** that Susan Koon is **DISMISSED** as a defendant in this litigation.

**IT IS FURTHER ORDERED** that the Clerk of Court shall update the docket to reflect that the Wisconsin Department of Corrections has been substituted for "Unknown" as a defendant in this litigation.

**IT IS FURTHER ORDERED** that a telephonic status conference will be held on

29

**August 18, 2009 at 2:30 p.m.** The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 29 day of July, 2009.

/s _____
LYNN ADELMAN
District Judge